IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**LINDA LINDBERG**,

        Plaintiff,

        vs.                         No.    **CIV 05-284 MCA/DJS**

**NEW MEXICO DEPARTMENT OF
TRANSPORTATION**, a state agency,
and **DARYL BUSCH**, **NOLAN LEBLANC**,
**ROBERT MEYERS**, and **JOHN TENISON**,
in their official and individual capacities,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant *New Mexico Department of Transportation's Motion for Summary Judgment* [Doc. 38] filed on April 10, 2006, and the *Motion for Summary Judgment on Plaintiff's Claims Against Defendants Daryl Busch, Nolan LeBlanc, Robert Meyers, and John Tenison* [Doc. 37] filed on April 10, 2006.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants Defendant NMDOT's motion, and the individual Defendants' motion is granted in part and denied in part, for the reasons set forth below.

## I.    <u>BACKGROUND</u>

On or about May 14, 2004, Plaintiff Linda Lindberg filed a charge of discrimination against Defendant New Mexico Department of Transportation (NMDOT) (f/k/a New Mexico

Highway Department) with the Equal Employment Opportunity Commission (EEOC), alleging that she was subjected to sexual harassment in the form of a hostile work environment, disparate treatment based on her gender, and retaliation.  [Ex. 1 to Doc. 43.] After receiving a right-to-sue notice from the EEOC, Plaintiff commenced this civil action on March 16, 2005.

Plaintiffs' *Complaint* names four individual Defendants, in addition to Defendant NMDOT, and groups her charges of discrimination and retaliation into the following legal theories:  (1) that Defendant NMDOT engaged in a continuing violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e-17, from December 30, 1996, through September 15, 2003, by subjecting her to sexual harassment in the form of a hostile work environment; (2) that Defendant NMDOT violated Title VII by subjecting her to a hostile work environment in retaliation for her complaints of sexual harassment and sex discrimination; (3) that Defendants Daryl Busch, Nolan LeBlanc, Robert Meyers, and John Tenison (collectively "the individual Defendants") engaged in a continuing violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, which is actionable under 42 U.S.C. § 1983, by subjecting her to sexual harassment in the form of a hostile work environment from December 30, 1996, through September 15, 2003; (4) that through their sexual harassment the individual Defendants constructively discharged Plaintiff from her position in Defendant NMDOT's Field Exploration and Testing Unit in violation of the Equal Protection Clause and 42 U.S.C. § 1983; (5) that Plaintiff exercised her First Amendment rights by voicing complaints about sex discrimination and sexual

harassment, and the individual Defendants retaliated by subjecting her to further harassment in the form of a hostile and abusive work environment; (6) that Plaintiff exercised her First Amendment rights by voicing complaints about workplace safety and waste of public funds, and the individual Defendants retaliated by subjecting her to a hostile and abusive work environment; and (7) that Defendant NMDOT breached an implied employment contract with Plaintiff in violation of state law.

On March 27, 2006, the Defendants filed a *Motion to Exclude Testimony Associating Plaintiff's Reported Psychological Symptoms with Posttraumatic Stress Disorder.* [Doc. 34.] That motion pertains to the permissible scope of expert testimony by Plaintiff's clinical psychologist, Samuel Roll, Ph.D, and is more appropriately addressed closer to trial. As the disputed portion of Dr. Roll's proposed testimony only concerns the scope of Plaintiff's damages for emotional distress, its admissibility does not affect other, dispositive motions.

On April 10, 2006, Defendant NMDOT and the individual Defendants each filed a motion for summary judgment as to all claims brought against them in this action. [Doc. 37, 38.] The parties were granted numerous extensions of time and extensions of page limits with respect to the briefing of these motions. [Doc. 26, 27, 36, 41, 45, 46, 47, 49, 53, 54, 55, 56, 61, 62.] The result is that briefing was not completed until more than two months later on June 15, 2006, and the parties have submitted approximately 1,000 pages of written materials for the Court's review.

This *Memorandum Opinion and Order* will not attempt to list every instance of alleged misconduct or disputed evidence contained in the parties' voluminous filings. The

basic sequence of events described in the evidence of record, however, can be summarized as follows.

Plaintiff began her employment with Defendant NMDOT in 1993.  [Lindberg Dep. at 59-60.]  The conduct which gives rise to her claims allegedly occurred during a period of approximately seven years from 1996 to 2003, during which Defendant NMDOT employed her in several different positions.  The main focus of Plaintiff's claims, however, is on her conditions of employment from the end of December 1996 until December 2002, while she worked as a Highway Geologist I in the Geotechnical Exploration Unit of the Geotechnical Design Section of the Materials Bureau.  [Lindberg Dep. at 7-12, 61-62.]

This position involved a substantial amount of statewide travel, during which Plaintiff was often responsible for supervising a crew of two or three other NMDOT employees on various geologic drilling assignments.  Plaintiff was the only woman that Defendant NMDOT employed in this type of position, and she claims that she was mistreated by her immediate supervisors in the Geotechnical Exploration Unit, Defendants Busch and LeBlanc, because of her gender.  She also claims that she reported this mistreatment to higher-level supervisors in the Materials Bureau, namely Defendants Meyers and Tenison, and that they failed to respond adequately.  [Doc. 1.]

In addition to reporting matters to Defendants Meyers and Tennison, the evidence of record reflects that Plaintiff lodged various internal complaints about her alleged mistreatment, as well as other issues, to Defendant NMDOT's Office of Equal Opportunity Programs (OEOP) and Office of Inspector General (OIG).  Plaintiff's communications with

the OEOP eventually resulted in an internal investigation conducted by a contractor. Evidence gathered during that investigation, including affidavits from Plaintiff and other NMDOT employees, is included in the record.  [Ex. C, D, E, F, G, M, N, O, Q, R, S, T, U, V, X, AA, BB, FF, GG, KK to Doc. 50.]

In December 2002, while the investigation was still pending, Defendant Meyers transferred or "detailed" Plaintiff to a different position in the Foundation Design Unit of the Geotechnical Design Section, where she was no longer under the direct supervision of Defendants Busch or LeBlanc.  The reason Defendant Meyers proffered for this transfer was that Plaintiff was experiencing severe tension with her drilling crew.  Plaintiff sent an e-mail message to Defendant Meyers agreeing to this transfer, but reported elsewhere (in the context of her sexual harassment complaints) that she was dissatisfied with the new position. [Lindberg Dep. at 7-12; Meyers Dep. at 37; Ex. 9, 10 to Doc. 43.]  In any event, Plaintiff contends that her mistreatment continued while she worked in the Foundation Design Unit from December 2002 until early May 2003.  [Doc. 1.]

On May 6, 2003, Plaintiff accepted a position as a Civil Engineering Technician in the Pavement Design Unit of the Materials Bureau.  This position allowed her to move to a different location where she was no longer under the supervision of Defendant Meyers (or, for that matter, Defendants Busch and LeBlanc), but it required her to take a 5% cut in pay. Plaintiff remained in that position until September 2003.  [Lindberg Dep. at 17-20; Ex. 13 to Doc. 43.]

On September 15, 2003, Plaintiff accepted a position as a Geoscientist in the Engineering Design Division of the Preliminary Design Bureau, Environmental Geology Section.  This position moved Plaintiff further away from her former supervisors (*i.e.*, the individual Defendants) and gave her higher pay than any of her previous positions. [Lindberg Dep. at 47-52; Ex. 15 to Doc. 43.]  Although Plaintiff does not allege that she was mistreated while occupying this position, she states that she would have preferred to keep her old job in the Geotechnical Exploration Unit but for the mistreatment she received there.  [Doc. 1.]

## II.  ANALYSIS

### A.  Standard of Review

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact, and that the moving party is entitled to judgment as a matter of law.  A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).  A fact is "material" if it might affect the outcome of the case.  See id. at 248.  Judgment is appropriate "as a matter of law" if the non-moving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party initially must make a *prima facie* showing that summary judgment is appropriate under Fed. R. Civ. P. 56.  If the moving party makes such a *prima facie*

showing, then the burden of going forward shifts to the non-moving party, who must show by affidavit or otherwise that a genuine issue of material fact remains for the factfinder to resolve.  See Celotex Corp., 477 U.S. at 323.

When an individual defendant raises the affirmative defense of qualified immunity in a summary-judgment motion, the burden shifts to the plaintiff to establish that the defendant's actions violated a constitutional or statutory right and that the right at issue was clearly established at the time of the defendant's unlawful conduct.  See Gross v. Pirtle, 245 F.3d 1151, 1155-56 (10th Cir. 2001).  If the plaintiff fails to meet this burden, then the Court must grant the defendant qualified immunity.  See id. at 1156.  If the plaintiff does establish the violation of a clearly-established constitutional or statutory right, then (for purposes of the defendant's summary-judgment motion) the burden shifts to the defendant to prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.  See id.

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex Corp., 477 U.S. at 324.  Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion.  Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995).  In addition, the Court may disregard an affidavit that contradicts the affiant's own sworn deposition testimony if the Court finds that such an affidavit constitutes an attempt to create a "sham fact issue."  Franks

v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986); see also Darnell v. Target Stores, 16 F.3d 174, 177 (7th Cir. 1994) (concluding that parties cannot create material issues of fact by submitting affidavits that contradict their own deposition testimony).

In this case, the parties have submitted affidavits, exhibits, and deposition testimony that contain hearsay and hearsay within hearsay.  In reviewing these materials to determine whether the Defendants are entitled to summary judgment, the Court does not consider statements that affiants or deponents attribute to others for the purpose of proving the truth of the matters asserted therein, except for admissions by a party opponent (or agent thereof) which the affiant or deponent witnessed.  See Fed. R. Evid. 801(d)(2).  The Court does, however, consider statements attributed to third parties for other admissible purposes.  In particular, such statements may be considered for the limited purpose of showing their effect on the listener (such as the effect of sexually harassing Plaintiff).  See generally Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993); see, e.g., Rupp v. Purolator Courier Corp., 45 F.3d 440 (10th Cir. 1994) (unpublished opinion applying this rule in a sexual harassment case).  They also may be considered as verbal acts or operative facts when legal consequences flow from the utterance of the statements.  See generally Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087 (10th Cir. 2001); see, e.g., Griswold v. Fresenius USA, Inc., 978 F. Supp. 718, 722 (N.D. Ohio 1997) (applying this rule in a sexual harassment case).  In very limited circumstances, the type of statements in question may provide circumstantial proof of the knowledge, intent, or state of mind of the declarant.  See generally Fed. R. Evid. 803(3); see, e.g., United States v. Joe,

8 F.3d 1488, 1492 (10th Cir. 1993) (applying this rule to a declarant's statement that she was "afraid"); United States v. Freeman, 514 F.2d 1184, 1190 (10th Cir. 1975) (applying this rule to a declarant's statement of future intent to perform an act when the occurrence of that act was at issue).

Apart from these limitations imposed by the Federal Rules of Evidence, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the admissible evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all admissible evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

In this case, the Defendants have submitted additional evidence with their reply briefs. The general rule is that when a movant submits additional evidence in support of summary judgment after the filing of the non-movant's response, district courts have the option of either disregarding that additional evidence or providing the non-movant with the opportunity to file a surreply.  See Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1163-65 (10th Cir. 1998).  This rule applies here, except to the extent that the exhibits attached to Defendants' reply briefs merely duplicate evidence previously submitted with their opening briefs or Plaintiff's responses.  The Court elects to disregard any new evidence submitted for the first time with Defendants' reply briefs, in lieu of allowing a surreply.

**B.**     **Plaintiff's Title VII Claims Against Defendant NMDOT**

Plaintiff's *Complaint* asserts Title VII claims against Defendant NMDOT for discrimination and retaliation in the form of a hostile work environment.  In its motion for summary judgment, Defendant NMDOT asserts that all of Plaintiff's Title VII claims are untimely because she did not file a charge of discrimination with the EEOC or the designated state agency within 300 days of the alleged discriminatory conduct.

Defendant NMDOT correctly cites the general rule that:

> Title 42 U.S.C. § 2000e-5(e)(1) is a charge filing provision that  "specifies with precision" the prerequisites that a plaintiff must satisfy before filing suit.  Alexander v. Gardner-Denver Co., 415 U.S. 36, 47 (1974).  An individual must file a charge within the statutory time period and serve notice upon the person against whom the charge is made.  In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice;  in all other States, the charge must be filed within 180 days.  A claim is time barred if it is not filed within these time limits.

Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002).  New Mexico is a "deferral state" where the 300-day limit applies.  See Mascheroni v. Bd. of Regents of Univ. of Cal., 28 F.3d 1554, 1557 n.3 (10th Cir. 1994), overruled in part on other grounds by Morgan, 536 U.S. at 117-18.

For purposes of exhausting her administrative remedies as a prerequisite to filing this civil action, it is undisputed that Plaintiff filed her charge of discrimination with the EEOC on May 14, 2004.  [Ex. 1 to Doc. 43.]  Applying the general rule cited above, it follows that Plaintiff's Title VII claims in this civil action may not reach acts of discrimination or

retaliation that occurred more than 300 days before that date, *i.e.*, July 21, 2003.  See 42 U.S.C. § 2000e-5(e)(1).

Plaintiff asserts that the Court should find an exception to this general rule and extend the 300-day limit by applying the continuing-violation doctrine and the doctrine of equitable tolling.  For purposes of Plaintiff's Title VII claims, the continuing-violation doctrine requires the Court to define what constitutes an "unlawful employment practice" and when such a practice "occurred."  See Morgan, 536 U.S. at 109-110.

Where a discrete, easily identifiable act amounts to a "unlawful employment practice," as in the case of "termination, failure to promote, denial of transfer, or refusal to hire," there is no justification for grouping various acts together as a single, "continuing violation" for purposes of calculating the applicable statute of limitations.  Id. at 114.  In particular, Plaintiff's transfer from the Geotechnical Exploration Unit to the Foundation Design Unit in December 2002, as well as her transfer from the Foundation Design Unit to the Pavement Design Unit in May 2003, are discrete acts that occurred before the 300-day limitations period and cannot be grouped together as a "continuing violation" for purposes of extending that limitations period.  Similarly, Plaintiff's transfer from the Pavement Design Unit to the Preliminary Design Bureau in September 2003 is a discrete act that cannot be grouped together with prior conduct for the purpose of establishing a continuing violation.[1]

---

[1]Plaintiff's *Complaint* does not allege that the September 2003 transfer was, in itself, a discrete act of discrimination or retaliation in violation of Title VII.

But Title VII's definition of an "unlawful employment practice" also encompasses claims for a "hostile work environment," which is "composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Id. at 117. The very nature of such claims "involves repeated conduct" that "occurs over a series of days or perhaps years," in which each separate "act of harassment may not be actionable on its own." Id. at 115-16. For these reasons, the Supreme Court found it permissible to treat the various acts which collectively amount to a "hostile work environment" as a "continuing violation" for purposes of calculating the limitations period for Title VII claims. Id. at 117.

It does not follow, however, that hostile work environment claims can reach back into the indefinite past merely by showing that one act of harassment occurred within Title VII's 300-day limitations period.

> Morgan explains that when analyzing a hostile work environment claim spanning longer than 300 days "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." Id. at 120. Morgan emphasizes that there must be a relationship between acts alleged after the beginning of the filing period and the acts alleged before the filing period: "if an act on day 401 had no relation to the acts between days 1-100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act." Id. at 118. Morgan holds that a series of alleged events comprises the same hostile environment where "the pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." Id. at 120 (citation to court below omitted).

Duncan v. Manager, Dep't of Public Safety, 397 F.3d 1300, 1308-09 (10th Cir. 2005).

-12-

In this case, Plaintiff has not come forward with evidence of any act of sexual or retaliatory harassment occurring on or after July 21, 2003, that bears a significant relationship to the prior acts of harassment under the test articulated in Morgan and Duncan. The undisputed facts and evidence of record reflect that on July 21, 2003, Plaintiff was working in NMDOT's Pavement Design Unit at a different location from her former co-workers in the Geotechnical Exploration Unit and no longer under the supervision of Defendants LeBlanc, Busch, or Meyers.  [Lindberg Dep. at 18-21.]  She has identified no specific acts of discrimination or retaliation that occurred on or after July 21, 2003.  Thus, the transfer to the Pavement Design Unit was an intervening action that precludes Plaintiff from grouping the events occurring on or after July 21, 2003, with those occurring before that date in order to establish a continuing violation.

Plaintiff asserts that even without the benefit of the continuing-violation doctrine, her claims stemming from before July 21, 2003, are still timely if the deadline for filing her charges with the EEOC is equitably tolled.   In support of such equitable tolling, Plaintiff points to evidence that she was involved in an internal grievance process with the NMDOT's Office of Equal Opportunity Programs in 2002, and that she had one or more communications with the EEOC in 2002-2003 regarding a potential class-action lawsuit against the NMDOT.  According to Plaintiff, she mistakenly believed that she had to go through NMDOT's internal-grievance process before going to the EEOC and that she had satisfied the requirement of filing a charge with the EEOC during her prior communications with that agency.

-13-

Plaintiff acknowledges that the Tenth Circuit thus far has not allowed equitable tolling of the limitations period for Title VII claims except in cases of "active deception."  See Mascheroni, 28 F.3d at 1562-63 (collecting cases).  Further, "the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods" under Title VII.  Delaware State Coll. v. Ricks, 449 U.S. 250, 261 (1980); see Lucas v. Chicago Transit Authority, 367 F.3d 714, 721-23 (7th Cir. 2004) (collecting cases).

In this case, the evidence of record does not support a reasonable inference that Plaintiff's delay in filing her charge with the EEOC was the result of active deception as to Title VII's procedural requirements or the effect of her employer's internal grievance process.  The "Employee Civil Rights Handbook" submitted with Plaintiff's response brief plainly states that the internal grievance procedure contained therein "shall not affect the right of the complainant to pursue the matter with any State or Federal enforcement agency. Unlawful discrimination complaints must be timely filed concurrently with any external agency to meet State or Federal deadlines."  [Ex. 3-B to Doc. 52.]  Plaintiff also candidly admits in her response that she "has no evidence suggesting that anyone actively misled her." [Doc. 52, at 16.]

Instead, Plaintiff asserts that the doctrine of equitable tolling should be expanded to cover situations such as hers where an employee is likely to have a meritorious claim but for her good-faith mistaken belief that one or more of her previous communications would be construed as an EEOC charge.  Although I recognize that this issue ultimately may require

-14-

resolution by an appellate court, I conclude that existing precedent leaves no room for a district court to expand the doctrine of equitable tolling in the manner requested here.

Expanding this doctrine to cover Plaintiff's Title VII claims would not only be contrary to the "active deception" line of authorities cited above, it also would run afoul of the general rule in this circuit that "claims accrue and '[t]he statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action.'" Alexander v. State of Oklahoma, 382 F.3d 1206, 1215 (10th Cir. 2004) (quoting Indus. Constructors Corp. v. United States Bureau of Reclamation, 15 F.3d 963, 969 (10th Cir.1994)).   This rule applies to civil rights actions "'when facts that would support a cause of action are or should be apparent.'" Id. (quoting Fratus v. Deland, 49 F.3d 673, 675 (10th Cir.1995)).  Thus, "[t]he key [to accrual] is knowledge of the injury; ... it does not matter whether the plaintiff realizes that a legal wrong has occurred." Tolston v. National Railroad Passenger Corp., 102 F.3d 863, 865 (7th Cir.1996).  "'[A] plaintiff's subjective and correct understanding of her legal rights is not the test for accrual. Otherwise a claim might never accrue and the limitations clock might never start to run.'" Barr-Rhoderick v. Albuquerque Pub. Schs., No. 04-327 MCA/ACT, Doc. 189, at 38 (D.N.M. Apr. 3, 2006) (unpublished memorandum opinion and order quoting Weyrick v. New Albany-Floyd County Sch. Corp., No. No. 4:03-CV-0095-DFH-WGH, 2004 WL 3059793, at *12 (S.D. Ind. Dec. 23, 2004)).  The Tenth Circuit has steadfastly applied this rule and declined to expand the doctrine of equitable tolling even when the underlying claims are not only meritorious but compelling.  See Alexander, 382 F.3d at 1220 (concluding that the statute

-15-

of limitations left no legal avenue for pursuing claims based on the Tulsa Race Riot of 1921, in which a white mob burned down 42-square blocks of an African American neighborhood and scattered machine-gun fire indiscriminately at its residents).

For these reasons, I conclude that the evidence of record in this case does not support a reasonable inference that the factual prerequisites for equitable tolling are satisfied. Accordingly, Defendant NMDOT is entitled to summary judgment on all of Plaintiff's Title VII claims.

### C.      Plaintiff's § 1983 Claims Against the Individual Defendants

In addition to her Title VII claims against Defendant NMDOT, Plaintiff asserts several constitutional claims against the individual Defendants under 42 U.S.C. § 1983. Before addressing the merits of these claims, I must first ascertain whether or to what extent they are barred by the statute of limitations.

### 1.      Continuing Violations Under 42 U.S.C. § 1983

Unlike her Title VII claims, Plaintiff's civil-rights claims against the individual Defendants under 42 U.S.C. § 1983 are not subject to a requirement of exhausting administrative remedies, and thus the 300-day limitations period discussed above has no application to Plaintiff's § 1983 claims. See generally Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 460-61 (1975) (collecting cases); Brown v. Hartshorne Pub. Sch. Dist. #1, 864 F.2d 680, 682-83 (10th Cir. 1988), appeal after remand, 926 F.2d 959, 962 (10th Cir. 1991). Instead, the three-year statute of limitations for Plaintiff's § 1983 claims runs from the date she filed this civil action on March 16, 2005. See Garcia v. Wilson, 731 F.2d

640, 651 (10th Cir. 1984), aff'd, 471 U.S. 261 (1985).   Under such a three-year limitations period, this civil action may reach violations of 42 U.S.C. § 1983 which occurred on March 16, 2002, or thereafter.

Defendant asserts that any violations of 42 U.S.C. § 1983 occurring before that date are time-barred because the continuing-violations doctrine has no application to civil-rights claims under 42 U.S.C. § 1983.   I disagree with this assertion.   While it is true that the Supreme Court's task in Morgan was to construe the statutory language in Title VII, the general principles invoked in completing that task can be readily applied to determine what violations of other statutes fall within the limitations periods for those statutes.   See O'Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir. 2006) ("[T]he distinction between 'continuing violations' and 'discrete acts' is not an artifact of Title VII, but is rather a generic feature of federal employment law."); Sharpe v. Cureton, 319 F.3d 259, 267 (6th Cir. 2003) (finding "no principled basis upon which to restrict Morgan to Title VII claims"); Hildebrandt v. Illinois Dep't of Natural Resources, 347 F.3d 1014, 1036 n.18 (7th Cir. 2003) (collecting cases extending Morgan to claims under 42 U.S.C. § 1983).

Under these authorities, determining the applicability of the continuing-violation doctrine articulated in Morgan does not necessarily depend on whether the statute at issue includes some administrative procedure or deadline as a prerequisite to filing suit.   Rather, the critical question is how the relevant statutory or constitutional provisions define the scope and duration of a violation for purposes of calculating the limitations period applicable to that violation.   Title VII, for example, prohibits the "occurrence" of an "unlawful

employment practice."   See Morgan, 536 U.S. at 109-110 (construing 42 U.S.C. §

2000e-5(e)(1)).   This wording is broad enough to include a claim for a hostile work

environment, which involves repeated conduct over a course of time that amounts to a single

violation.   See id. at 115-17.

> 42 U.S.C. § 1983 provides that:
>
>> Every person who, under color of any statute, ordinance, regulation,
>> custom, or usage, of any State or Territory or the District of Columbia,
>> subjects, or causes to be subjected, any citizen of the United States or other
>> person within the jurisdiction thereof to the deprivation of any rights,
>> privileges, or immunities secured by the Constitution and laws, shall be liable
>> to the party injured in an action at law, suit in equity, or other proper
>> proceeding for redress.

42 U.S.C. § 1983.  Like the occurrence of an unlawful employment practice, subjecting a

person to the deprivation of his or her constitutional rights may involve discrete acts (such

as discharging an employee on a particular date) as well as repeated conduct over a period

of time (such as the acts which collectively constitute a hostile work environment).

Thus, I cannot automatically discount the possibility of applying the continuing-

violation doctrine to all § 1983 claims.   Instead, I must examine each § 1983 claim

individually to determine where it falls in the framework articulated in Morgan and its

progeny.

### 2.      Plaintiff's Equal Protection Claims

I first examine Plaintiff's equal-protection claims to determine whether or to what

extent they are barred by the three-year statute of limitations.  One of these claims is that the

individual Defendants constructively discharged Plaintiff from the Exploration Unit of the

Geotechnical Design Section in December 2002.  A constructive discharge is the type of discrete act which does not constitute a continuing violation under the <u>Morgan</u> framework. <u>See</u> <u>id.</u> at 114.   While it is true that the working conditions which lead to a constructive discharge may involve repeated conduct over a period of time, <u>see, e.g.</u>, <u>Woodward v. City of Worland</u>, 977 F.2d 1392, 1402 (10th Cir. 1992), the violation occurs when the employee is actually discharged from the position.  To conclude that a constructive discharge is a continuing violation simply because there are other instances of misconduct leading up to the discharge would allow the exception to swallow the rule, for in that case one could argue that every type of discrete act identified in <u>Morgan</u> (*e.g.*, termination, failure to promote, denial of transfer, or refusal to hire) is a continuing violation based on the events leading up to that final act.

I reach a different conclusion as to Plaintiff's equal-protection claim for sexual harassment in the form of a hostile work environment.  The Tenth Circuit has recognized that it would "constitute a constitutional violation" for a "a state employee exercising governmental authority over" a person to subject that person to sexual harassment.  <u>Maestas v. Lujan</u>, 351 F.3d 1001, 1009  (10th Cir. 2003).  In particular, "[s]exual harassment [by a public official or employee] can violate the Fourteenth Amendment right to equal protection of the laws thus triggering a § 1983 cause of action."  <u>Lankford v. City of Hobart</u>, 73 F.3d 283, 286 (10th Cir.1996).  "'[I]n [disparate-treatment] discrimination suits, the elements of a plaintiff's case are the same ... whether that case is brought under §§ 1981 or 1983 or Title VII.'"  <u>Maldonado v. City of Altus</u>, 433 F.3d 1294, 1307 (10th Cir. 2006) (quoting <u>Drake</u>

v. City of Fort Collins, 927 F.2d 1156, 1162 (10th Cir.1991)); accord Hildebrandt, 347 F.3d

at 1036.  Thus, it is logical to conclude that the kinds of equal-protection claims that are

actionable under 42 U.S.C. § 1983 include the type of hostile work environment previously

articulated in Title VII cases.  See Nieto v. Kapoor, 268 F.3d 1208, 1217-18 (10th Cir. 2001)

(citing Meritor Sav. Bank v. Vinson, 477 U.S. 57, 73 (1986)); Maldonado, 433 F.3d at 1308.

And the continuing-violation doctrine may apply to a hostile work environment claim under

42 U.S.C. § 1983 just as it applies to such a claim under Title VII.  See Hildebrandt, 347

F.3d at 1036 n.18.

    This conclusion does not end the Court's inquiry because "Morgan emphasizes that

there must be a  relationship between acts alleged after the beginning of the filing period and

the acts alleged before the filing period" in order for all such acts to fit within the definition

of a single, continuing violation.  Duncan, 397 F.3d at 1308-09.  Such a relationship exists

"where 'the pre- and post-limitations period incidents involve[d] the same type of

employment actions, occurred relatively frequently, and were perpetrated by the same

managers.'"  Id. (quoting Morgan, 536 U.S. at 120).

    The evidence of record does not support a reasonable inference that all of the acts

occurring in Plaintiff's employment from 1996 to 2003 can be grouped into one continuing

violation.  Viewing this evidence in the light most favorable to Plaintiff, the most that can

be reasonably inferred is that there was a continuing violation in the form of a hostile

working environment during Plaintiff's employment in the Geotechnical Exploration Unit

from 1998 to the end of 2002, when she was transferred or "detailed" to another unit in a different location with a different supervisor.

This conclusion is not fatal to Plaintiff's hostile work environment claim, because the three-year statute of limitations period extends back to March 2002. Indeed, even without the continuing-violation doctrine, Plaintiff's hostile work environment claim is timely as to the conduct occurring on March 21, 2002, and thereafter. And even if acts prior to that date are untimely, the Court may consider them "as background evidence in support of a timely claim." Morgan, 536 U.S. at 113.

The individual Defendants assert that, regardless of the continuing-violation doctrine, Plaintiff's hostile work environment claim cannot reach back to the period of Plaintiff's employment in the Geotechnical Exploration Unit because the law regarding equal-protection claims involving sexual harassment in the form of a hostile work environment was not clearly established during that period. They further contend that even if the law generally recognized the viability of an equal-protection claim for sexual harassment before that time, there was an absence of clearly established law on how to apply such a claim to the specific type of allegations and the specific types of Defendants named in Plaintiff's *Complaint*.

The individual Defendants are correct that a lack of clearly established law provides a basis for asserting the defense of qualified immunity, and qualified immunity may bar claims for the period in which the law was not clearly established even if Plaintiff otherwise would be able to reach such claims through the continuing-violation doctrine. See, e.g., Maldonado, 433 F.3d at 1316 (concluding that the law was not clearly established as to

-21-

whether the use of English-only rules in the workplace could constitute a hostile work environment).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  But "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  Hope v. Pelzer, 536 U.S. 730, 741, 745 (2002); accord Holland v. Harrington, 268 F.3d 1179, 1197 (10th Cir. 2001).  The "salient question" is whether the state of the law at the time of the incident gave the individual defendants "fair warning" that their conduct was unconstitutional.  Hope, 536 U.S. at 741.

In this case, I conclude that the law in effect since 1998 gave the individual Defendants fair warning that their alleged conduct in creating a hostile work environment for Plaintiff based on her gender violated the Equal Protection Clause.  While the individual Defendants' contention that there is no clearly established law in this context relies primarily on a footnote to an unpublished order and judgment that has no precedential value, see Mitchell v. City and County of Denver, 112 Fed. Appx. 662, 671 n.11 (10th Cir. 2004), Plaintiffs point to an abundance of published opinions from this and other circuits to show "the law holding that sexual harassment is actionable as an equal protection violation has long been clearly established."  Sh.A. ex rel. J.A. v. Tucumcari Mun. Schs., 321 F.3d 1285, 1288 (10th Cir.2003); accord Maestas, 351 F.3d at 1009.

The history of judicial recognition of this type of equal-protection claim is recounted in Woodward, 977 F.2d at 1397. Woodward cites Bohen v. City of East Chicago, 799 F.2d 1180, 1185-87 (7th Cir.1986), as the first published circuit court opinion to recognize an equal-protection claim for sexual harassment. But such a claim did not become clearly established law in the Tenth Circuit until 1989, when the Tenth Circuit cited Bohen with approval in Starrett v. Wadley, 876 F.2d 808, 814 (10th Cir.1989). See Woodward, 977 F.2d at 1398.

The Tenth Circuit has rejected prior attempts to distinguish Bohen and its progeny by requiring "exact correspondence between prior cases and the instant facts." Sh.A. ex rel. J.A., 321 F.3d at 1288. "[T]he concept of clearly established law should not be applied too literally." Johnson v. Martin, 195 F.3d 1208, 1216 (10th Cir.1999) (citation omitted). Thus, this concept does not require "'that there must be a case presenting the exact fact situation at hand in order to give parties notice of what constitutes actionable conduct.'" Id. (quoting Murrell v. Sch. Dist. No. 1, Denver, Colo., 186 F.3d 1238, 1251 (10th Cir.1999)). Instead, courts "merely require the parties to make a reasonable application of existing law to their own circumstances." Id.

It is a reasonable application of the authorities cited above to conclude that the types of sexual harassment which are actionable under 42 U.S.C. § 1983 include the intentional creation of a hostile working environment by an individual or group of individuals within a state government agency who hold positions of authority over their victim. It is also a reasonable application of the existing law to conclude that such a hostile work environment

may take the form of shunning or demeaning Plaintiff because of her gender (as opposed to making sexual advances or seeking sexual favors from her), especially when such mistreatment is aimed at undermining Plaintiff's authority as a supervisor so that she cannot effectively perform the essential functions of supervising her drilling crew.

Viewed in the light most favorable to Plaintiff, the evidence of record depicts an "old boy's club" in which a clique of male employees, governed exclusively by male supervisors or managers, meet privately with one another and reserve the most favorable and least demanding work assignments, working hours, equipment, training, support staff, and other resources for themselves while systematically depriving a similarly situated lone female employee of such benefits.  Such conduct can constitute a form of hostile or abusive working environment, and it is nothing new; it has been recognized by courts since the time Bohen and Woodward were decided:

> "Sexual harassment of female employees by a state *employer* constitutes sex discrimination for purposes of the equal protection clause of the fourteenth amendment.  Creating abusive conditions for female employees and not for male employees is discrimination.... *Forcing* women and not men to work in an environment of sexual harassment is no different than forcing women to work in a dirtier or more hazardous environment than men simply because they are women.  Such unjustified unequal treatment is exactly the type of behavior prohibited by the equal protection clause...."

Woodward, 977 F.2d at 1401 (quoting Bohen, 799 F.2d at 1185).

> Our inquiry turns on whether the alleged harassment occurred because of the sex of the complainant, thus we ask whether she was "'exposed to disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed.'"  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 25 (1993) (Ginsburg, J. concurring)).  Harassment is not limited to acts of sexual

desire, see Smith v. Sheahan, 189 F.3d 529, 534 (7th Cir.1999); Shepherd v. Slater Steels Corp., 168 F.3d 998, 1008 (7th Cir.1999) (quoting Oncale, 523 U.S. at 80), but rather is a broad term which "encompasses all forms of conduct that unreasonably interfere with an individual's work performance or create an intimidating, hostile, or offensive working environment." McKenzie v. Ill. Dep't. of Transp., 92 F.3d 473, 479 (7th Cir.1996) (citing Meritor Sav. Bank, 477 U.S. at 64, 106 S.Ct. 2399).

Haugerud v. Amery Sch. Dist., 259 F.3d 678, 692 (7th Cir. 2001); accord Hildebrandt, 347 F.3d at 1033, 1036 (applying these definitions to a claim under 42 U.S.C. § 1983).

The individual Defendants nevertheless assert that there is no clearly established law extending an equal-protection claim to this form of harassment in this circuit. In particular, they note that liability under Title VII is generally limited to employers, see Maldonado, 433 F.3d at 1316, while in this instance Plaintiff's equal-protection claim is directed against individual employees, who can only be held liable for intentional discrimination under 42 U.S.C. § 1983, see id. at 1307.

Again, I disagree that such differences between the methods of establishing an employer's liability under Title VII and the methods of establishing an individual employee or supervisor's liability under 42 U.S.C. § 1983 would preclude a reasonable application of the existing law defining a hostile work environment to the context of an equal-protection claim under the latter statute. The Tenth Circuit set forth a framework for determining individual liability for sexual harassment in Woodward, 977 F.2d at 1400, where it emphasized that this type of claim is limited to intentional conduct by persons who occupy a position of authority over the victim, such as supervisors. See also Whitney v. State of New Mexico, 113 F.3d 1170, 1174-75 (10th Cir.1997) (recognizing an equal-protection

claim against an individual government employee who allegedly sexually harassed a non-employee while exercising state authority over her application for a license).

This framework accords with the existing body of law requiring Plaintiff to prove intentional discrimination in order to succeed on an equal-protection claim in this context. See Maldonado, 433 F.3d at 1307-08.  It also accords with the existing body of law setting the parameters under which a person may be sued in their individual capacity under a theory of supervisory liability.  See Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997) (requiring an affirmative link between the supervisor's conduct and the constitutional violation in order to establish supervisory liability under 42 U.S.C. § 1983); Holland, 268 F.3d at 1187 (same).

For these reasons, I conclude that there is clearly established law dating from at least 1998 which defeats one element of the individual Defendants' defense of qualified immunity as to Plaintiff's equal-protection claim for sexual harassment in the form of a hostile work environment.  In order to fully defeat the individual Defendants' motion for summary judgment on this claim, however, Plaintiff still must present evidence to support a reasonable inference that each of the individual Defendants violated her right to equal protection in this manner.

Borrowing from Title VII cases where appropriate, the Tenth Circuit has applied the requirements for proving a hostile work environment to a claim under 42 U.S.C. § 1983 as follows:

"For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" Meritor, 477 U.S. at 67, (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir.1982)); Harris v. Forklift Sys. Inc., 510 U.S. 17, 21 (1993).

Since its decision in Meritor, both the Supreme Court and this Court have clarified the meaning of "hostile environment" and the facts necessary to prove such a claim. In deciding whether or not a hostile environment existed, it is necessary to look to all the circumstances involved in the situation. These may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23; see also Lockard v. Pizza Hut, Inc., 162 F.3d 1062 (10th Cir.1998).

Nieto, 268 F.3d at 1218. "[A] claimant in a hostile environment harassment case must show that the environment would be reasonably perceived (objectively), and is perceived (subjectively), as hostile or abusive." Id. (citations omitted).

Under this definition, not every instance of bothersome or inappropriate behavior is deemed to create a hostile work environment. The standards developed by the Supreme Court for determining whether such an environment exists are not intended to become a "'general civility code'" encompassing the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). "[T]he statute does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." Oncale, 523 U.S. at 81. Nevertheless, careful consideration must be given to "the social context in which particular behavior occurs and is experienced by its target." Id.

These limitations on the definition of a hostile work environment are fatal to Plaintiff's hostile work environment claim insofar as it is based solely on conduct occurring after she was transferred from the Geotechnical Exploration Unit in December 2002.   The incidents occurring after that date are not as severe and are simply too few and far between to independently constitute a hostile work environment in any of the positions that Plaintiff occupied after she left the Geotechnical Exploration Unit.  In addition, the evidence of record does not identify the perpetrators behind these incidents, so it is difficult to make the inference that they constituted *intentional* harassment directed at Plaintiff by any of the individual Defendants.

Because Plaintiff's equal-protection claim for a hostile work environment is brought against the individual Defendants under 42 U.S.C. § 1983 rather than under Title VII's framework for determining employer liability, she "'must show, through either direct or indirect evidence, that the discrimination complained of was intentional,'" *i.e.*, that the individual Defendants acted "with the intent to create a hostile work environment." Maldonado, 433 F.3d at 1307-08 (quoting EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1191 (10th Cir.2000)).   Such intent is particularly important in the context of claims under  42 U.S.C. § 1983 because this statute is not intended to impose liability on supervisors for mere negligence in failing to notice or respond to improper conduct by a subordinate.   See Woodward, 977 F.2d at 1399 & n.11 (discussing requirements for supervisory liability under 42 U.S.C. § 1983).

The evidence of record in this case easily supports a reasonable inference that Defendants LeBlanc and Busch, working as Plaintiff's immediate supervisors in the Geotechnical Exploration Unit from 1998 to 2002, engaged in acts of harassment based on Plaintiff's gender that were intentional, severe, and pervasive.  Plaintiff has pointed to specific evidence in the record to support the inference that Defendants LeBlanc and Busch treated another similarly situated employee, Mr. Wenman, more favorably than Plaintiff because of his gender, and that these gender-based differences in treatment had the effect of altering Plaintiff's conditions of employment, such that she could no longer safely and effectively supervise her drilling crew in the Geotechnical Exploration Unit.

The role of Defendants Meyers and Tenison is more problematic because they were not Plaintiff's immediate supervisors and the evidence of record does not show that they had actual, timely, and complete knowledge of every incident that transpired among Plaintiff, other male employees, and Defendants LeBlanc and Busch.  While there is evidence that Defendants Meyers and Tenison either were directly involved in, or had personal knowledge of, some of the objectionable incidents that contributed to a hostile work environment, it is difficult to say that these incidents, standing alone, were severe or pervasive enough to create a hostile work environment, or that Defendants Meyers and Tenison acted with the *intent* to create a hostile work environment for Plaintiff by means of these incidents.  Rather, the most that can be reasonably inferred from the admissible evidence of record is that Defendants Meyers and Tenison were *negligent* in failing to respond in a more firm and even-handed manner to Plaintiff's complaints.  For these reasons, I conclude that Defendants Meyers and

Tenison are entitled to summary judgment on Plaintiff's equal-protection claim for sexual harassment in the form of a hostile work environment.

I next turn to Plaintiff's constructive discharge claim relating to her transfers to other positions after she allegedly was forced out of the Geotechnical Exploration Unit when her relations with her drilling crew and immediate supervisors reached a boiling point in December 2002. The evidence of record supports a reasonable inference that Defendants Meyers and Tenison had more direct involvement in these transfers. Further, "[i]t has been clearly established since at least 1985 that constructive discharge from employment as to which an employee has a protectable property or liberty interest may be actionable under § 1983." Woodward, 977 F.2d at 1401.

It is not clearly established in this circuit, however, that the doctrine of constructive discharge can be extended to the situation where an employee is transferred, demoted, or assigned new duties or a new supervisor instead of being discharged. "[C]onduct which meets the definition of a 'tangible employment action' or an 'adverse employment action' is not necessarily sufficient to establish a constructive discharge because a constructive discharge requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but intolerable." Tran v. Trs. of the State Colls. in Colo., 355 F.3d 1263, 1270-71 (10th Cir. 2004) (citing Mallinson-Montague v. Pocrnick, 224 F.3d 1224, 1231-32 (10th Cir.2000). Because in this case Plaintiff never left her employment with Defendant NMDOT, and there is no clearly established law recognizing a claim for

"constructive transfer" or "constructive demotion" under 42 U.S.C. § 1983, I conclude that all of the individual Defendants are entitled to qualified immunity on such claims.

In response to the individual Defendants motion for summary judgment on this issue, Plaintiff cites the principle that "'[a] demotion or reassignment to a job with lower status or lower pay may, depending upon the individual facts of the case, constitute aggravating factors that would justify a finding of constructive discharge.'"   Douglas v. Orkin Exterminating Co., 215 F.3d 1336, 2000 WL 667982, at *4 (10th Cir. 2000) (unpublished disposition quoting James v. Sears, Roebuck & Co., Inc., 21 F.3d 989, 993 (10th Cir. 1994)). This principle is particularly relevant in the context of a claim for breach of an employment contract to fill a particular position, where courts must consider "the magnitude of change in title and compensation contemplated by the employment contract."   Id.; see Gormley v. Coca-Cola Enters., 2005-NMSC-003, ¶¶ 12-21, 137 N.M. 192, 109 P.3d 280 (similar); cf. Carter v. Ball, 33 F.3d 450, 459 (4th Cir.1994) (recognizing that a demotion which "is essentially a career-ending action or a harbinger of dismissal" may give rise to a constructive-discharge claim).   Transfer or demotion of a sufficient magnitude also may be among the "aggravating factors that make staying on the job intolerable" and eventually lead to an employee's constructive discharge.   James, 21 F.3d at 992.

But Plaintiff never left her employment with Defendant NMDOT, and she has cited no authorities extending these principles from the context of Title VII or breach-of-contract claims to that of an equal-protection claim against an individual employee or supervisor under 42 U.S.C. § 1983.  The closest that Plaintiff comes to finding such authority is the lone

opinion of the Fifth Circuit in <u>Jett v. Dallas Indep. Sch. Dist.</u>, 798 F.2d 748, 755 (5th Cir.

1986).  Even in the Fifth Circuit, however, constructive discharge does not include "a slight

decrease in pay coupled with some loss of supervisory responsibilities," <u>Jurgens v. EEOC</u>,

903 F.2d 386, 392 (5th Cir.1990, and "cannot be based upon the employee's subjective

preference for one position over another."  <u>Jett</u>, 798 F.2d at 755.  Accordingly, I conclude

that all of the individual Defendants are entitled to qualified immunity on Plaintiff's equal-

protection claim for constructive discharge because of the absence of clearly established law

in this context.

It does not follow from this conclusion that Plaintiff's transfer from the Geotechnical

Exploration Unit in December 2002, or her subsequent transfers within the NMDOT, are

irrelevant to her equal-protection claim for the hostile work environment she allegedly

experienced at the hands of Defendants LeBlanc and Busch while working in that unit.  The

analysis provided above shows that there are disputed issues of material fact as to whether

Defendants LeBlanc and Busch are liable in their individual capacities for intentionally

creating a hostile work environment for Plaintiff in violation of the Equal Protection Clause

during the period when she worked in the Geotechnical Exploration Unit from 1998 to 2002.

Evidence that higher-level managers, such as Defendants Meyers or Tenison, felt the need

to take the extraordinary step of transferring or "detailing" Plaintiff to a different position in

order to diffuse the situation in the Geotechnical Exploration Unit is relevant to determining

whether a hostile work environment existed in that unit and the effect such harassment had

on Plaintiff.  Due to the absence of clearly established law on the subject, however, I

conclude that such evidence does not provide a reasonable basis for extending Plaintiff's equal-protection claim to reach Defendants Meyers or Tenison based on their role in the transfers.

For the foregoing reasons, the individual Defendants' motion for summary judgment on Plaintiff's equal-protection claims is denied in part with respect to the hostile work environment claim against Defendants LeBlanc and Busch.  Insofar as it pertains to Plaintiff's other equal-protection claims, this motion is granted in part with respect to the constructive discharge claim against all individual Defendants and with respect to the hostile work environment claim against Defendants Meyers and Tenison.

It appears that Plaintiff has abandoned any claims against the individual Defendants in their official capacity under 42 U.S.C. § 1983, and therefore summary  judgment is granted on those claims as well (to the extent that Plaintiff's *Complaint* may be construed as raising them).  Similarly, the Court will not consider the "class of one" equal protection claim that Plaintiff raises for the first time in her response brief, because that claim was not timely pleaded in her *Complaint*.  See Green Country Food Market, Inc. v. Bottling Group, LLC, 371 F.3d 1275, 1279-81 (10th Cir. 2004); Evans v. McDonald's Corp., 936 F.2d 1087, 1091 (10th Cir. 1991).

### 3.    Plaintiff's First Amendment Retaliation Claims

In addition to her equal-protection claims, Plaintiff's *Complaint* asserts First Amendment claims against the individual Defendants based on her contentions that she spoke out on matters of public concern and that the individual Defendants retaliated by create

a hostile work environment.  [Doc. 1.]  In response to the individual Defendants' motion for

summary judgment, Plaintiff points to the following specific instances of speech for which

she claims protection under the First Amendment:   (1) a letter of December 3, 2001,

addressed to Defendant LeBlanc with copies to Defendants Busch, Meyers, and Tenison,

complaining of a hostile work environment, gender discrimination, improper use of state

equipment and leave time, and workplace safety issues; (2) a follow-up letter of December

11, 2001, regarding the same issues; (3) an statement Plaintiff filed with the OEOP on July

15, 2002, as part of Defendant NMDOT's internal grievance procedure; (4) a written

response dated August 30, 2002, complaining of gender discrimination and harassment

regarding matters discussed in a letter Plaintiff received from Defendant LeBlanc; and (5)

a portion of Plaintiff's work diary that she submitted to the OEOP on March 20, 2003, to

substantiate her claims of sexual harassment  [Doc. 50, at 46-48.]

       To evaluate these First Amendment retaliation claims, the Court employs a four-part

balancing test for determining whether a public employer's actions impermissibly infringe

on free speech rights of employees.  See Pickering v. Bd. of Educ., 391 U.S. 563 (1968).

Under this test, the Court first must decide whether the speech at issue touches on a matter

of public concern.  If it does, the Court must balance the interest of the employee in making

the statement against the employer's interest in promoting the efficiency of the public

services it performs through its employees.  If these prerequisites are met, then the speech

is protected, and the Court next considers whether the employee has shown that her

expression was a motivating factor in the detrimental employment decision. Finally, even if

the employee sustains this burden, the employer can still prevail if it shows by a preponderance of the evidence that it would have made the same decision regardless of the protected speech.  See id. at 568; Bd. of County Comm'rs v. Umbehr, 518 U.S. 668, 685 (1996); Schalk v. Gallemore, 906 F.2d 491, 494-95 (10th Cir.1990).

In this case, some of Plaintiff's remarks may satisfy the first and second elements of the Pickering test. "Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of [government] officials, in terms of content, clearly concerns matters of public import." Conaway v. Smith, 853 F.2d 789, 796 (10th Cir. 1988). The complaints about workplace safety or improper use of government resources contained in Plaintiff's two letters of December 2001 may fall under this category.

This does not end the Court's inquiry, however, because the Supreme Court recently clarified the scope of the Pickering test in Garcetti v. Ceballos, 126 S. Ct. 1951 (2006). There the Court reemphasized that the First Amendment does not empower public employees to "'constitutionalize the employee grievance.'" Id. at 1959 (quoting Connick v. Myers, 461 U.S. 138, 154 (1983)). In addition, the Court broke new ground in holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 1960. This holding is significant here, because it arguably may limit a public employee's First Amendment claims to speech occurring outside the workplace or outside normal working hours, such as " a teacher's letter to a local newspaper addressing issues including the funding policies of his school board,"

id. at 1957, or a questionnaire on political matters distributed to one's co-workers before or after work, see Connick, 461 U.S. at 141.  Insofar as Plaintiff crafted and delivered her complaints about workplace safety or misuse of government resources while she was on duty and in the course of carrying out her official job responsibilities, they cannot provide viable grounds for a First Amendment retaliation claim in the wake of Garcetti, 126 S. Ct. at 1960.

The Supreme Court's recent opinion on this subject also precludes the Court from treating Plaintiff's internal employee grievances as protected speech under the First Amendment.  See id. at 1959.  The Tenth Circuit has long held that "speech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern." David v. City and County of Denver, 101 F.3d 1344, 1355 (10th Cir.1996).  In this regard, the Court "'will consider the motive of the speaker to learn if the speech was calculated to redress personal grievances [and therefore spoken as an employee] or to address a broader public purpose [and therefore spoken as a citizen].'" Id. (quoting Workman v. Jordan, 32 F.3d 475, 483 (10th Cir. 1994)).  Applying this test, the Court concludes that Plaintiff's complaints about her working conditions and duty assignments, including the materials or statements she submitted to the OEOP as part of Defendant NMDOT's internal grievance procedures and her response to being disciplined by Defendant LeBlanc, are not "protected speech" which may form grounds for a First Amendment claim against the individual Defendants.

Assuming for purposes of analysis that there is a residuum of protected speech that touches on a matter of public concern but was not made in the course of Plaintiff's official

job duties, the next step in evaluating Plaintiff's First Amendment retaliation claims is to determine whether the evidence of record supports a reasonable inference that this speech was a motivating factor in a detrimental employment decision made by one or more of the individual Defendants, and whether these Defendants have shown that they would have made the same decision regardless of the protected speech.  See Pickering, 391 U.S. at 568; Umbehr, 518 U.S. at 685.  Plaintiff's claims stumble on this step as well because her *Complaint* alleges that the retaliation took the form of a hostile work environment rather than a discrete act, such as a transfer or demotion, that can be causally linked to the protected speech which preceded it.

Even with respect to retaliation claims under Title VII, there is a circuit split as to whether retaliation can take the form of a hostile work environment or requires some kind of discrete act in order to constitute an "adverse employment action" under that statutory scheme.  See Noviello v. City of Boston, 398 F.3d 76, 89 (1st Cir. 2005) (collecting cases and adopting the majority view, shared by the Tenth Circuit, that "under  Title VII, the creation and perpetuation of a hostile work environment can comprise a retaliatory adverse employment action under §42 U.S.C.  2000e-3(a).  First Amendment retaliation claims are even more problematic because they do not necessarily employ the same definition of "adverse employment action" as Title VII claims, and thus an employee may have an actionable First Amendment retaliation claim if his or her protected speech results in some detrimental action of a lower magnitude, such as removing one of the employee's job duties, changing an employee's work schedule, or transferring an employee to another facility.  See,

-37-

e.g., Schuler v. City of Boulder, 189 F.3d 1304, 1309-10 (10th Cir. 1999); Dill v. City of Edmond, 155 F.3d 1193, 1205 (10th Cir. 1998). But cf. Lybrook v. Farmington Mun. Schs. Bd. of Educ., 232 F.3d 1334, 1340 & n.2 (10th Cir. 2000) (concluding that some actions may be so trivial as to fall below the threshold required for a showing of retaliation in this context).

The lower threshold required to state an actionable retaliation claim under the First Amendment may create difficulties in applying the continuing-violation doctrine articulated in Morgan, or the definition of a "hostile work environment" articulated in Title VII cases. As the Third Circuit recently noted, "the Morgan rule that individually actionable allegations cannot be aggregated is of particular import in the context of First Amendment retaliation claims." O'Connor, 440 F.3d at 127.   "First Amendment retaliation claims are always individually actionable, even when relatively minor," so long as the act of retaliation "would be sufficient to 'deter a person of ordinary firmness' from exercising his or her First Amendment rights." Id. at 127-28 (quoting Suppan v. Dadonna, 203 F.3d 228, 234-35 (3d Cir.2000), and citing Rutan v. Republican Party, 497 U.S. 62, 76 n. 8 (1990)).

A consequence of this lower threshold for making retaliatory conduct actionable under the First Amendment is that a series of repeated acts which otherwise might need to be grouped together in order to fit Title VII's definition of a "hostile work environment" instead explodes into several discrete, individually actionable instances of retaliation.  To the extent that "[a] First Amendment retaliation claim will lie for any individual act which meets this 'deterrence threshold,' and that threshold is very low," it is questionable whether the various

acts of retaliation which Plaintiff alleges in this case can be aggregated into a global claim

of a retaliatory hostile work environment for purposes of invoking the continuing-violation

doctrine articulated in Morgan in the context of a First Amendment retaliation claim under

42 U.S.C. § 1983.  Id. at 128.  As in O'Connor, it appears that the conduct giving rise to this

type of claim is more appropriately treated as a series of  discrete acts of retaliation, each of

which might have been individually actionable if Plaintiff had timely pleaded them as such

in her *Complaint*.  See id. at 126 n.1, 128.

Another problem with pleading a First Amendment retaliation claim in terms of a

hostile work environment spanning several years is that it becomes more difficult to causally

link the creation of such a work environment as an intentional response to a specific instance

of protected speech.  Causation is further complicated when, as here, the Plaintiff alleges

numerous instances of protected speech over the course of several years of employment, as

well as numerous instances of retaliatory conduct in response to her speech.  This situation

makes it difficult to determine which instances of protected speech are causally linked to

which instances of retaliatory conduct, and how such instances are to be grouped into

discrete violations for the purpose of calculating the three-year statute of limitations.

As with Plaintiff's other claims under 42 U.S.C. § 1983, she must prove that each of

the individual Defendants acted intentionally in retaliating against her because of her

exercise of First Amendment rights.  See Wulf v. City of Wichita, 883 F.2d 842, 863 (10th

Cir. 1989) (concluding that "omissions and oversights amount at most to simple negligence,

which cannot form the basis for a First Amendment claim").  To the extent that one or more

of the individual Defendants already created a hostile work environment for Plaintiff based on her gender in 1998 or earlier, it is hard to make the inference that a particular instance of protected speech occurring after that date was a substantial motivating factor leading the individual Defendants to continue the pre-existing hostile work environment for retaliatory purposes.   See Umbehr, 518 U.S. at 685 (noting that temporal proximity alone does not establish protected speech as the cause of an alleged retaliatory act).   Under these circumstances, a general allegation of a retaliatory hostile work environment spanning several years is too vague to establish a specific causal nexus with the instances of protected speech at issue here. See Hullman v. Bd. of Trustees of Pratt Cmty. Coll., 950 F.2d 665, 668 (10th Cir. 1991).

For the foregoing reasons, I conclude that each of the individual Defendants is entitled to qualified immunity on Plaintiff's First Amendment retaliation claims.  In light of the new limitations imposed by the Supreme Court's recent opinion in Garcetti and the problems articulated above with respect to extending the definition of a "hostile work environment" to the context of First Amendment retaliation claims, I conclude that the law is not clearly established as to the particular type of claim set forth in Plaintiff's pleading.

### D.   Plaintiff's State-Law Claim Against Defendant NMDOT

The final dispositive matter to be addressed in this *Memorandum Opinion and Order* is Plaintiff's state-law claim that Defendant NMDOT breached an implied employment contract by failing to implement the provisions of its "Employee Civil Rights Handbook" after an outside investigator delivered a report concerning Plaintiff's internal grievance with

the OEOP on March 5, 2004.  Plaintiff concedes that the two-year limitations period stated

in N.M. Stat. Ann. § 37-1-23 (Michie 2004) bars her other contract claims, which became

actionable before that date.  [Doc. 52, at 18.]

The relevant portions of the "Employee Civil Rights Handbook" concerning the

procedure following the issuance of the outside investigator's report are as follows:

> *  The [OEOP] will review the investigation report and other information and
> issue a Report of Findings (ROF).
> *   The ROF will be provided to the complainant, the respondent and to
> appropriate management personnel.
> *  The appropriate management personnel will review the ROF and develop
> a plan of action as necessary.
> *  The [OEOP] or the IA will meet with the employee and the appropriate
> supervisor responsible for implementing the plan of action.
> *  The final resolution and conciliatory resolution will be monitored by the
> [OEOP].

[Ex. 3-B to Doc. 52, at 11.]  The handbook also contains a general introductory provision

that:  "Every reported incident will be investigated by the [OEOP] or the Independent

Investigator.  Prompt remedial steps will be taken to resolve the complaint and to protect

against retaliation."  [Ex. 3-B to Doc. 52, at 2.]

Plaintiff presented deposition testimony and other evidence from an OEOP employee,

Ernesto Padilla, who reviewed the outside investigator's report and recommended findings

in March 2005.  [Ex. 3, 3-A to Doc. 52.]  The OEOP did not proceed to issue and distribute

a Report of Findings or formulate a plan of action, however, because by March 2005 Plaintiff

had retained counsel and filed this civil action.  [Doc. 1.]

Defendant contends that Plaintiff cannot prevail on her breach of contract claim relating to these handbook provisions because she has not proven causation or damages. New Mexico courts recognize the general principle that "the plaintiff in a contract action must prove his or her damages by a preponderance of the evidence in order to be entitled to compensation for them." Servants of the Paraclete, Inc. v. Great Am. Ins. Co., 866 F. Supp. 1560, 1578 (D.N.M. 1994) (citing Mitchell v. Lovato, 97 N.M. 425, 427, 640 P.2d 925, 927 (1982), and Stevens v. Mitchell, 51 N.M. 411, 414, 186 P.2d 386, 389 (1947)). Further, "'damages for emotional distress are not recoverable in an action for breach of an employment contract, whether express or implied, in the absence of a showing that the parties contemplated such damages at the time the contract was made.'" Martinez v. Northern Rio Arriba Elec. Coop., Inc., 2002 NMCA-083, ¶ 22, 132 N.M. 510, 51 P.3d 1164 (quoting Silva v. Albuquerque Assembly & Distribution Freeport Warehouse Corp., 106 N.M. 19, 20, 738 P.2d 513, 514 (1987)).

Here it is Plaintiff's burden to present evidence creating a disputed issue of material fact as to whether both parties "contemplated emotional distress at the time the employment contract was initially made." Bourgeous v. Horizon Healthcare Corp., 117 N.M. 434, 440, 872 P.2d 852, 858 (1994). She has not done so. "Parties to an employment contract primarily exchange services for salary and benefits. Although people may attach great personal and emotional significance to their employment, employment contracts principally serve an economic purpose." Francis v. Lee Enters., Inc., 971 P.2d 707, 714 (Haw. 1999) (citing Silva, 106 N.M. at 20, 738 P.2d at 514). The evidence of record gives no indication

-42-

that Plaintiff's employment contract with NMDOT departed from this primary economic purpose.

As for damages other than emotional distress, Defendant NMDOT points to the absence of evidence showing that prompt compliance with the post-report obligations of the "Employee Civil Rights Handbook" would have resulted in any additional compensation or benefits for Plaintiff.  In this regard, it is important to note that by the time the outside investigator issued her report in March 2004, Plaintiff already had transferred to the Environmental  Geology Section, where she was receiving higher pay and had no ongoing complaints of discrimination or retaliation.   [Lindberg Dep. at 47-52.]   Further, the provisions of the handbook cited by Plaintiff do not guarantee that the OEOP would adopt the findings proposed or suggested by the investigation report, nor do these provisions guarantee any financial reward or economic benefit as part of a "plan of action" resulting from a "Report of Findings."  [Ex. 3-B to Doc. 52.]

While it may be argued that the OEOP did not comply with its commitment to take "[p]rompt remedial steps . . . to resolve the complaint," the handbook provisions also require prompt action on the part of the employee:  "The employee must file an internal formal complaint of discrimination within 60 days from the date of the alleged act or within ten (10) days of the termination of Informal Conflict Resolution or ADR, whichever is the later date." [Ex. 3-B to Doc. 52, at 10.]    Further, the procedure outlined in the handbook "only addresses allegations or concerns involving matters that may form the basis of a complaint as defined [elsewhere] in the Handbook."  [Ex. 3-B to Doc. 52, at 5.]

Here Plaintiff initiated a complaint spanning a period much longer than 60 days, and the statute of limitations period has run as to much of that period. Accordingly, it is reasonable to construe the OEOP's obligations under the handbook as only covering the 60-day period leading up to her internal complaint. To the extent that Plaintiff is permitted to extend her allegations beyond that period, it is only fair to allow the OEOP and its investigator a similar extension of time to complete their reporting obligations and formulate a plan of action. For all of the above reasons, I conclude that Defendant NMDOT is entitled to summary judgment on Plaintiff's state-law claim for breach of contract.

## III.   **CONCLUSION**

Based upon the undisputed facts, Defendant NMDOT is entitled to summary judgment on Plaintiff's Title VII and breach-of-contract claims, and the individual Defendants are entitled to summary judgment on Plaintiff's constructive discharge and First Amendment retaliation claims. In addition, Defendants Meyers and Tenison are entitled to summary judgment as to Plaintiff's equal-protection claim for sexual harassment in the form of a hostile work environment. The motion for summary judgment is denied in part, however, with respect to Plaintiff's equal-protection claim for sexual harassment in the form of hostile work environment perpetrated by Defendants Busch and LeBlanc, because there are genuine issues of material fact regarding that claim as to those Defendants.

**IT IS, THEREFORE, ORDERED** that Defendant *New Mexico Department of Transportation's Motion for Summary Judgment* [Doc. 38] is **GRANTED**, and all of Plaintiff's claims against Defendant NMDOT are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the *Motion for Summary Judgment on Plaintiff's Claims Against Defendants Daryl Busch, Nolan LeBlanc, Robert Meyers, and John Tenison* [Doc. 37] is **GRANTED IN PART** with respect to Plaintiff's constructive discharge claim against all individual Defendants, Plaintiff's First Amendment retaliation claims against all individual Defendants, and Plaintiff's equal-protection claim for sexual harassment in the form of a hostile work environment against Defendants Meyers and Tenison, and thus all of Plaintiff's claims against Defendants Meyers and Tenison are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the *Motion for Summary Judgment on Plaintiff's Claims Against Defendants Daryl Busch, Nolan LeBlanc, Robert Meyers, and John Tenison* [Doc. 37] is **DENIED IN PART** with respect to Plaintiff's equal-protection claim for sexual harassment in the form of a hostile work environment against Defendants Busch and LeBlanc.

**SO ORDERED**, this 1st day of August, 2006, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

-45-